DONALD W. SEARLES, California Bar No. 135705
E-mail: searlesd@sec.gov
LORRAINE B. ECHAVARRIA, California Bar No. 191860
E-mail: echavarrial@sec.gov
ROBERT H. CONRRAD, California Bar No. 199498
E-mail: conrradr@sec.gov
C. DABNEY O'RIORDAN, California Bar No. 205158
E-mail: oriordand@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:    (323) 965-3998
Facsimile:    (323) 965-3908

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>   vs.<br><br>MAYNARD L. JENKINS,<br><br>           Defendant. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF SECTION 304 OF THE SARBANES-OXLEY ACT OF 2002** |

1    Plaintiff Securities and Exchange Commission (the "Commission") alleges
2    as follows:

3                                    **SUMMARY**

4         1.      By this action, the Commission seeks an order from this Court,
5    pursuant to Section 304 of the Sarbanes-Oxley Act, requiring Maynard L. Jenkins,
6    former chairman and chief executive officer of CSK Auto Corporation ("CSK"),
7    to reimburse CSK for all of his bonuses and other incentive-based and equity-
8    based compensation, and all of his profits realized from his sale of CSK stock,
9    during the 12-month period following the issuance of CSK's financial statements
10   contained in its annual reports for fiscal years 2002, 2003 and 2004, all of which
11   were required to be restated, not once, but twice, as a result of CSK's fraudulent
12   conduct.

13        2.      During a substantial portion of Jenkins' decade-long tenure as
14   chairman and chief executive officer of CSK, CSK was engaged in a pervasive
15   accounting fraud, which involved many of its most senior officers, that resulted in
16   CSK filing fraudulent financial statements in its annual reports for fiscal years
17   2002, 2003 and 2004, all of which Jenkins signed.

18        3.      During the period at issue, CSK was one of the largest specialty
19   retailers of automotive parts and accessories in the United States.  As a retailer of
20   automotive products, CSK purchased products from vendors that manufacture
21   automotive parts and accessories.  From at least fiscal years 2002 through 2004, a
22   significant portion of CSK's income was derived from allowances it received from
23   its vendors.  Vendor allowances are used to provide retailers, such as CSK, with
24   financial support to market the vendor's products.  In general, CSK accounted for
25   vendor allowances by reducing its costs of goods sold.  Thus, the more vendor
26   allowances CSK earned, the lower its costs of goods sold, resulting in greater
27   reported pre-tax income.  During the fiscal years at issue, CSK's accounting of its
28   / / /

1

vendor allowances were vital to CSK's financial results, and served to increase its reported pre-tax income by tens of millions of dollars each fiscal year.

4.      During fiscal years 2002, 2003, and 2004, CSK knew that there were millions of dollars of uncollectible vendor allowance receivables recognized in its financial statements.  Rather than write off the uncollectible receivables, as required by Generally Accepted Accounting Principles ("GAAP"), CSK engaged in a scheme to hide the uncollectible receivables through various accounting tricks.  In addition, during fiscal year 2003, CSK over-recognized millions of dollars of vendor allowances.

5.      If CSK had written off the uncollectible vendor allowances, it would have increased the company's expenses and decreased its income.  Because CSK concealed its uncollectible vendor allowances, CSK's required periodic reports filed with the Commission failed to comply with financial reporting requirements under the securities laws, misled the public about the company's financial performance, and materially overstated its pre-tax income as follows:  (a) by at least 47%, or $11 million, for fiscal year 2002; (b) by at least $34 million, thereby falsely reporting pre-tax income instead of an actual loss, for fiscal year 2003; and (c) by at least 65%, or $21 million, for fiscal year 2004.

6.      As a result of CSK's fraudulent conduct and material non-compliance with its financial reporting requirements under the securities laws it was required to prepare not one, but two accounting restatements.  CSK filed its first restatement as part of its Form 10-K annual report for fiscal year 2004 (the "First Restatement"), which Jenkins signed.  As part of the First Restatement, CSK reduced its previously recognized vendor allowances for fiscal years 2002, 2003, and the first three quarters of fiscal year 2004, but failed to properly account for, and write-off all known, uncollectible vendor allowance receivables.  The First Restatement also falsely attributed the vendor allowance adjustments to mere

/ / /

errors in estimates and bookkeeping mistakes rather than to CSK's fraudulent conduct.

7.      After additional accounting irregularities came to light, CSK announced on March 27, 2006, that it was conducting a special investigation relating to, among other things, vendor allowance accounting irregularities.  On May 1, 2007, CSK filed its Form 10-K for fiscal year 2005 restating, for the second time, its financial statements for 2002, 2003, and 2004 due, in part, to the fraudulent scheme relating to CSK's failure to write off uncollectible vendor allowances (the "Second Restatement").  Jenkins signed the Form 10-K for fiscal year 2005.

8.      During the 12-month periods following the issuance of CSK's 2002, 2003, and 2004 Forms 10-K (*i.e.,* from May 5, 2003 to May 2, 2005) Jenkins received over $2 million in compensation from CSK in the form of bonuses and other incentive-based and equity-based compensation.  During that same period, Jenkins also realized over $2 million in profits from the sale of CSK securities.

9.      Jenkins is required by Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243 (the "Act"), to reimburse CSK his bonuses and other incentive-based and equity-based compensation as well as the profits he realized from his sale of CSK securities during the relevant period.  To date, Jenkins has not complied, and has refused to comply, with the reimbursement requirements of Section 304.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 3(b) of the Act, 15 U.S.C. § 7202(b), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) & 78aa.

11.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Jenkins resides within this district and certain of the transactions, acts, practices and courses of conduct constituting

violations of the federal securities laws alleged in this Complaint occurred within this district.

## THE DEFENDANT

12.     **Maynard L. Jenkins**, age 66, is a resident of Scottsdale, Arizona and served as CSK's chief executive officer and chairman of the board from January 1997 until his retirement in August 2007.

## RELATED PARTIES

13.     **CSK** was a Delaware corporation with its principal executive offices in Phoenix, Arizona.  CSK became a publicly traded company in March 1999, and its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and listed on the New York Stock Exchange.  As of January 30, 2005, it operated 1,134 stores in nineteen states under three brand names: Checker Auto Parts, Schucks Auto Supply, and Kragen Auto Parts.  In 2008, after the conduct at issue, CSK became a wholly-owned subsidiary of O'Reilly Automotive, Inc.

14.     Based on the underlying fraudulent conduct summarized herein, on May 26, 2009, the Commission instituted settled cease-and-desist proceedings against CSK that found that CSK, which neither admitted nor denied the Commission's findings, had violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) & 78m(b)(2)(B), and Rules 10b-5, 12b-20, and 13a-1 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20 & 240.13a-1.  Among other things, the Commission ordered CSK to cease and desist from committing or causing any violations and any future violations of those provisions.

15.     **Martin G. Fraser** was CSK's chief operating officer and president from 2000 until September 2006, when he resigned at CSK's request.  On March 12, 2009, the Commission filed its first amended complaint in the District of

1   Arizona against Fraser, alleging, among other things, that by participating in the

2   underlying fraudulent conduct summarized herein, Fraser had violated Section

3   17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Sections 10(b), 13(a),

4   13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a),

5   78m(b)(2)(A) & 78m(b)(2)(B), and Rules 10b-5, 12b-20, and 13a-1 thereunder, 17

6   C.F.R. §§ 240.10b-5, 240.12b-20 & 240.13a-1.  *SEC v Fraser, et al*, CV 090443-

7   PHX-GMS.  In addition, based on the underlying fraudulent conduct, the U.S.

8   Department of Justice named Fraser as a defendant in a 31-count indictment, filed

9   on April 7, 2009, in the District of Arizona. *United States v. Fraser, et al*., CR 09-

10  372 PHX SRB LOA.

11          16.   **Don W. Watson** was CSK's chief financial officer, senior vice

12  president, and treasurer from January 1998 to September 2005.  Watson served as

13  CSK's chief administrative officer and senior vice president from September 2005

14  to his termination in October 2006.  Watson is also named as a defendant in the

15  Commission's March 12 action and in the Department of Justice's indictment.

16          17.   **Edward W. O'Brien** was CSK's controller and vice president from

17  March 2003 until his termination in September 2006.  O'Brien is also named as a

18  defendant in the Commission's March 12 action.  On April 7, 2009, O'Brien pled

19  guilty to obstruction of justice, in connection with the investigation conducted by

20  the U.S. Department of Justice of the underlying fraudulent conduct.

21          18.   **Gary M. Opper** was CSK's director of credit and receivables,

22  reporting to O'Brien, from March 17, 2003 until he was terminated in September

23  2006.  Opper is also named as a defendant in the Commission's March 12 action.

24  On April 15, 2009, Opper pled guilty to obstruction of justice, in connection with

25  the investigation conducted by the U.S. Department of Justice.

26  / / /

27  / / /

28  / / /

1    **BACKGROUND: CSK'S "LET'S WORK TOGETHER" PROGRAM**

2        19.     Although CSK had various vendor allowance programs, its largest

3    was its "Let's Work Together" program ("LWT").  Typically, LWT agreements

4    covered a one-year period, which CSK referred to as the "program year."

5    Although the LWT agreements varied, CSK generally earned LWT allowances at

6    a set dollar amount, as a percentage of the amount CSK spent to purchase the

7    vendor's product, or as a certain number of cents per item CSK purchased from

8    the vendor.

9        20.     CSK recognized LWT allowances ratably, on a monthly basis, based

10   on its estimate of the total allowances it expected to earn for the entire program

11   year.  In theory, CSK's estimate was based on the LWT agreements and CSK's

12   expected purchases from its vendors.  As CSK recognized LWT allowances for a

13   given program year, it increased the LWT account receivable for that program

14   year.  Each LWT program year had its own account receivable.  As CSK collected

15   LWT allowances for a particular program year, GAAP required that CSK reduce

16   the outstanding receivable for that same LWT program year.

17                **SUMMARY OF CSK'S FRAUDULENT SCHEME**

18   **I.     The Fraudulent Scheme To Avoid Vendor Allowance Write Offs.**

19       21.     During fiscal years 2002, 2003, and 2004, CSK was unable to collect

20   all of the vendor allowances it had recognized.  As a result, large accounts

21   receivable built up for each LWT program year.

22       22.     GAAP required that CSK write off the uncollectible LWT accounts

23   receivable.  Specifically, under Statement of Financial Accounting Standards No.

24   5 ("SFAS No. 5"), Accounting for Contingencies, Paragraph 8, an estimated loss

25   from a loss contingency shall be accrued by a charge to income if: (a) information

26   available prior to issuance of the financial statements indicates that it is probable

27   that an asset had been impaired at the date of the financial statements; and (b) the

28   amount of the loss can be reasonably estimated.  SFAS No. 5, Paragraph 3 defines

"probable" to mean that the future event or events are likely to occur. SFAS No. 5, Paragraph 4 states that examples of loss contingencies include collectibility of receivables. A write-off of the uncollectible LWT allowance receivables would have increased CSK's expenses during the fiscal year the write off was made, resulting in a decrease in pre-tax income.

23.     Instead of writing off CSK's uncollectible LWT accounts receivable and taking the requisite reduction to pre-tax income, CSK concealed its uncollectible LWT accounts receivable by:  (a) applying millions of dollars of LWT allowances earned and collected for later LWT program years to prior LWT program year accounts receivable (referred to within CSK as "filling the bucket"); and (b) incorrectly accounting for millions of dollars of LWT allowances it paid back to vendors. Through this scheme, CSK avoided writing off tens of millions of dollars in uncollectible LWT receivables, which it had previously recognized.

24.     CSK "filled the bucket" by taking LWT allowances collected for later program years and applying them to reduce an earlier LWT program year's account receivable. Specifically, CSK: (a) made baseless journal entries reducing the account receivable for a prior LWT program year with an offsetting increase to the account receivable for a later LWT program year; and (b) applied LWT allowance collections for a later LWT program year to an earlier program year's LWT account receivable.

25.     CSK also failed to write off LWT allowances it had over-collected for prior LWT program years and ultimately paid back to its vendors. Instead of writing off amounts CSK paid back, which would have reduced its pre-tax income, CSK increased a later LWT program year's account receivable, making it appear that it had collected an older account receivable when all CSK had done was move the outstanding receivable balance to a more recent year. This accounting treatment was contrary to GAAP because, by paying an amount back to a vendor

/ / /

7

1   for a prior LWT program year, CSK acknowledged its uncollectibility and should

2   have written off the amount.

3       **A.  <u>Fiscal Year 2002</u>**

4       26.     During its 2002 fiscal year, CSK failed to write off approximately $11

5   million of uncollectible vendor allowances it had recognized in previous years, most

6   significantly as part of the 2001 LWT program year.  Instead of writing off the

7   uncollectible vendor allowances, CSK: (a) made improper journal entries moving

8   approximately $6 million of collections for the 2002 LWT program to the 2001 LWT

9   account receivable; (b) misapplied paybacks of approximately $3 million to the 2002

10  LWT receivable; and (c) reached an agreement whereby a vendor agreed to accept an

11  invalid $2 million debit memo for the 2001 LWT program year in exchange for CSK

12  not collecting $2 million in allowances earned as part of the 2002 and 2003 LWT

13  program years.  As a result, in its Form 10-K filed on May 5, 2003, CSK materially

14  overstated its pre-tax income by approximately $11 million, or 47%.  At the time of

15  that filing, CSK knew, or was reckless in not knowing, that it had failed to write off

16  uncollectible vendor allowances and over recognized allowances, and that, as a result,

17  CSK's financial statements were materially misstated.

18      **B.  <u>Fiscal Year 2003</u>**

19      27.     During its 2003 fiscal year, CSK failed to write off approximately $24

20  million in uncollectible vendor allowances recognized during previous LWT

21  program years, primarily as part of the 2002 LWT program year.  Moreover, CSK

22  improperly and prematurely recognized $6 million in vendor allowances and

23  improperly recognized an additional $4 million of LWT allowances.  As a result, in

24  its Form 10-K filed on April 15, 2004, CSK overstated its 2003 pre-tax income by

25  approximately $34 million, turning its actual pre-tax loss of approximately $18

26  million into purported pre-tax income of $16 million.  At the time of that filing,

27  CSK knew, or was reckless in not knowing, that it had failed to write off

28  / / /

uncollectible vendor allowances and over recognized allowances, and that, as a result, CSK's financial statements were materially misstated.

28.     During fiscal year 2003, CSK hid approximately $24 million in uncollectible vendor allowance receivables.  First, CSK applied about $10 million in 2003 LWT program year collections to the 2002 LWT program year receivable. Second, CSK failed to write off approximately $5 million in vendor allowances CSK had over-collected during prior LWT program years but had to pay back during fiscal year 2003.  Third, CSK made a baseless journal entry decreasing the 2002 LWT receivable by $9 million and increasing the 2003 LWT receivable by the same amount, which reduced the 2002 LWT receivable to zero.

29.     During the fourth quarter of 2003, CSK prematurely recognized approximately $6 million in additional vendor allowances.  CSK did this by having vendors sign agreements making it appear that CSK had earned additional LWT allowances during 2003, when, in fact, those allowances would be earned, if at all, based on purchases made during 2004.

30.     At the end of fiscal 2003, CSK obtained approximately $4 million of additional warranty allowances from two vendors.  At that same time, CSK had a warranty deficit of approximately $13 million, which represented returns from customers covered by warranties in excess of the warranty accrual recorded by CSK.  Under GAAP, a warranty deficit should be written off unless additional warranty allowances are obtained to cover the deficit.  However, instead of applying the $4 million of additional warranty allowances to offset a portion of its warranty deficit balance, CSK improperly recognized those warranty allowances as additional LWT allowances.

## C. Fiscal Year 2004

31.     During fiscal year 2004, CSK failed to write off known, uncollectible vendor allowances totaling approximately $21 million.  Specifically, CSK:  (a) applied approximately $11 million in 2004 LWT program year

9

collections to the 2003 LWT account receivable; (b) increased the 2004 LWT receivable by approximately $4 million to avoid writing off amounts CSK paid back to vendors for the 2003 and 2002 LWT program years; and (c) moved approximately $6 million via baseless journal entries to the 2003 LWT receivable from other vendor allowance receivables in other time periods. As a result, in its Form 10-K filed on May 2, 2005, CSK overstated pre-tax income for fiscal year 2004 by approximately 65%, or $21 million. At the time of that filing, CSK knew, or was reckless in not knowing, that it had failed to write off uncollectible vendor allowances and that, as a result, the company's financial statements were materially misstated.

**II.   As A Result Of Its Fraud, CSK's Forms 10-K For Fiscal Years 2002, 2003, And 2004 Were In Material Non-Compliance With Financial Reporting Requirements Under The Securities Laws.**

32.     As required by Section 13(a) of the Exchange Act and Rule 13a-1 thereunder, CSK filed annual reports on Forms 10-K for fiscal years 2002, 2003, and 2004. Jenkins signed each of those annual reports and their accompanying Sarbanes-Oxley certifications.

33.     The notes to the financial statements included with CSK's Forms 10-K for fiscal years 2002, 2003, and 2004 falsely stated that "[s]pecific accounts are written off against the allowance when management determines the account is uncollectible." CSK did not write off known, uncollectible vendor allowance receivables, but rather engaged in a scheme to avoid and hide such write offs, as follows:

/ / /

/ / /

/ / /

/ / /

/ / /

| In all, CSK materially understated its costs of goods sold during fiscal years 2002 through 2004 as follows: FY | Concealed Receivables From Prior Years | | | Over Recognized Allowances / Other Uncollectible Receivables | Total |
|---|---|---|---|---|---|
| | Unsupported Journal Entries | Misapplied Debit Memos | Misapplied Paybacks | | |
| 2002 | $6 M | -- | $3 M | $2 M | $11 M |
| 2003 | $9 M | $10 M | $5 M | $10 M | $34 M |
| 2004 | $6 M | $11 M | $4 M | -- | $21 M |

34.    CSK's Forms 10-K for fiscal years 2002, 2003 and 2004 overstated CSK's pre-tax income by approximately $11 million (or 47%), $34 million (thereby reporting pre-tax income instead of a pre-tax loss) and about $21 million (or 65%), respectively.  When CSK filed those Forms 10-K, CSK knew, or was reckless in not knowing, that the company's financial statements contained therein was materially misstated.

35.    As set forth above, the financial statements in those annual reports failed to comply with GAAP, namely, EITF No. 02-16 and FAS No. 5. Regulation S-X states that financial statements filed with the Commission that are not prepared in accordance with GAAP are presumed to be inaccurate and misleading.  17 C.F.R. §210.4-01(a)(1).  By virtue of its conduct alleged above, CSK violated the anti-fraud provisions of the securities laws, namely, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; the reporting requirements of the securities laws, namely, Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder; the books and records provisions of the securities laws, namely, Section 13(b)(2)(A) of the Exchange Act; and the internal controls provisions of the securities laws, namely, Section 13(b)(2)(B) of the Exchange Act.

**III.     CSK Was Required to Prepare Two Accounting Restatements.**

36.     As set forth above, CSK, filed annual reports in its Forms 10-K for fiscal years 2002, 2003 and 2004 that failed to comply with GAAP and the financial reporting requirements under the securities laws.

37.     Due to CSK's material non-compliance with financial reporting requirements under the securities laws, which were the result of CSK's fraudulent conduct as set forth above, CSK was required by GAAP and the federal securities laws to prepare an accounting restatement.  Specifically, an accounting restatement was required by, among other things, (a) Paragraph 13 of Accounting Principles Board ("APB") Opinion No. 20, Accounting Changes, which states that "[e]rrors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were presented;" (b) Paragraph 36 of APB Opinion No. 20 which states that the correction of such errors "should be reported as a prior period adjustment;" and (c) paragraph 18 of APB Opinion No. 9, Reporting the Results of Operations, which states that "when comparative statements are presented, prior period adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, to reflect the retroactive application of these prior period adjustments."  In addition, Paragraph 25 of Statement of Financial Accounting Standards 154, Accounting Changes and Error Corrections, a replacement of APB Opinion 20 and FASB Statement 3, states that "[a]ny error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment by restating the prior period financial statements."

38.     In fact, CSK issued two restatements in connection with its vendor allowance accounting.  CSK's Form 10-K for fiscal year 2004 included CSK's First Restatement, which partially restated CSK's vendor allowances recognized

12

during prior years.  CSK partially restated its vendor allowances because it could not collect all of the 2003 LWT receivable.  In addition, CSK restated for vendor allowances paid back during fiscal year 2003 that CSK failed to properly write off during the 2003 fiscal year.  CSK's First Restatement regarding vendor allowances resulted in CSK adjusting its costs of sales upward and its pre-tax income downward, for the first three quarters of 2004, and the 2003, 2002, and 2001 fiscal years by $1.9 million, $7.1 million, $9.0 million, and $0.5 million, respectively.

39.     CSK's First Restatement, however, failed to: (a) write off all known, uncollectible vendor allowance receivables; (b) disclose the full extent of CSK's efforts to hide the uncollectible receivables from its independent auditors; and (c) disclose CSK's over recognition of vendor allowances during fiscal 2003.  It also falsely attributed the vendor allowance restatement to mere "errors in estimation in earlier periods" and "vendor allowances recorded in improper periods" due to "imprecise estimates, bookkeeping errors and recording allowances in the incorrect periods."  CSK knew, or was reckless in not knowing, about the false disclosures and misstatements contained in its First Restatement.

40.     CSK issued its First Restatement as part of its annual report for fiscal year 2004.  Thereafter, CSK's internal audit department, which in the wake of the First Restatement scrutinized CSK's vendor allowances more carefully, discovered additional irregularities that led to a special investigation, which CSK publicly announced on March 27, 2006.  On September 28, 2006, CSK announced, among other things, that: (a) it had substantially completed its special investigation; (b) it no longer employed Watson, its former chief financial officer, and Fraser, its former chief operating officer and president; and (c) that Jenkins would soon be retiring and would assist CSK in its search for a new CEO.  As a result of its special investigation, CSK terminated the employment of O'Brien, its controller, and Opper, its director of credits and receivables.

/ / /

13

1    41.    On May 1, 2007, CSK filed a second restatement for fiscal years

2    2002, 2003, and 2004, as part of its Form 10-K for fiscal year 2005, which Jenkins

3    signed (the "Second Restatement").  The Second Restatement disclosed, among

4    other things, that: (a) CSK had identified "accounting errors and irregularities"

5    that materially impacted vendor allowance receivables; (b) there were "numerous

6    instances of improperly supported journal entries recorded to the general ledger

7    accounts, override of Company policies and procedures, absence of appropriately

8    designed policies and procedures, misapplication of GAAP and other ineffective

9    controls"; (c) the "errors and irregularities were primarily the result of actions

10   directed by certain personnel and an ineffective control environment"; and (d) the

11   "recording of improper accounting entries was directed by certain personnel."

12   **IV.   Jenkins Received Bonuses And Profits From The Sale Of CSK Stock.**

13   42.    During the 12-month periods following CSK's filing of its

14   fraudulent Forms 10-K for fiscal years 2002, 2003, and 2004 (*i.e.,* from May 5,

15   2003 to May 2, 2006) Jenkins received bonuses and other incentive-based and

16   equity-based compensation from CSK.  During the 12-month periods following

17   CSK's filing of its fraudulent, and subsequently restated, 2002 and 2003 annual

18   reports, Jenkins received bonuses of approximately $825,413 and $1,265,607,

19   respectively, totaling approximately $2,091,020.  In addition, during the 12-month

20   periods following CSK's filing of its annual reports for its 2002 and 2004 fiscal

21   years, Jenkins realized profits of approximately $2,018,893 from the sale of CSK

22   stock.  Jenkins has never reimbursed CSK for any portion of his bonuses and other

23   incentive-based and equity-based compensation, or his stock sale profits.

24   **CLAIM FOR RELIEF**

25   **FAILURE TO REIMBURSE**

26   **Violations of Section 304(a) of the Act**

27   43.    The Commission realleges and incorporates by reference ¶¶ 1

28   through 42 above.

14

44.     CSK, by engaging in the conduct described above, filed Forms 10-K for fiscal years 2002, 2003, and 2004 that were in material non-compliance with financial reporting requirements under the securities laws.

45.     CSK's material non-compliance with its financial reporting requirements under the securities laws was the result of its misconduct that was designed to inflate its income fraudulently by prematurely recognizing vendor allowances and failing to write off known, uncollectible vendor allowances in violation of GAAP.

46.     Due to CSK's material non-compliance with its financial reporting requirements under securities laws, and as a result of its misconduct, CSK was required to prepare an accounting restatement for fiscal years 2002, 2003 and 2004.

47.     The Commission has not exempted Jenkins, pursuant to Section 304(b) of the Act, 15 U.S.C. § 7243(b), from the application of Section 304(a) of the Act, 15 U.S.C. § 7243(a).

48.     By engaging in the conduct described above, Jenkins violated, and unless ordered to comply will continue to violate, Section 304(a) of the Act, 15 U.S.C. § 7243(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Jenkins committed the alleged violations.

### **II.**

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), ordering Jenkins to reimburse CSK for his bonuses and other incentive-based and equity-based compensation, and profits from CSK stock sales, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

**III.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**IV.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  July 22, 2009                    Respectfully submitted,


                                         s/  Robert H. Conrrad
                                         ROBERT H. CONRRAD
                                         Attorney for Plaintiff
                                         Securities and Exchange Commission