1  DONALD W. SEARLES, California Bar No. 135705
   E-mail: searlesd@sec.gov
2  C. DABNEY O'RIORDAN, California Bar No. 205158
   E-mail: oriordand@sec.gov
3

4  Attorneys for Plaintiff
   Securities and Exchange Commission
5  Rosalind R. Tyson, Regional Director
   Michele Wein Layne, Associate Regional Director
6  John M. McCoy III, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
7  Los Angeles, California 90036-3648
   Telephone:   (323) 965-3998
8  Facsimile:   (323) 965-3908

9

10                 **UNITED STATES DISTRICT COURT**

11                      **DISTRICT OF ARIZONA**

12  SECURITIES AND EXCHANGE          Case No. CV-09-01510-PHX-GMS
    COMMISSION,
13                                   **REPLY TO OPPOSITION TO**
                                     **PLAINTIFF SECURITIES AND**
14              Plaintiff,           **EXCHANGE COMMISSION'S**
         vs.                         **MOTION FOR PARTIAL SUMMARY**
15                                   **JUDGMENT AGAINST DEFENDANT**
    MAYNARD L. JENKINS,              **MAYNARD L. JENKINS**
16
                Defendant.          Date:        December 10, 2010
17                                  Time:        9:00 a.m.
                                    Place:       Courtroom 602
18                                               (Hon. G. Murray Snow)

19

20

21

22

23

24

25

26

27

28

## I.       INTRODUCTION

Consider the following facts:  On May 5, 2007, CSK files its 2005 Form 10-K in which it announces the results of its year-long $26 million internal investigation into its accounting practices.  Based on the results of that investigation, CSK states that it is required to restate its earnings for fiscal years 2001 to 2005 as a result of management's misconduct.  Assume further that CSK goes on to describe the nature of management's misconduct in such detail that no reasonable person could conclude that the restatement was the result of anything other than management's intentional accounting fraud. Finally, assume that Maynard Jenkins admits as much, in signing and certifying CSK's Form 10-K, in apologizing to the public in a related press, and in his sworn testimony before the Commission.  Based on these facts, where both CSK and its CEO have admitted each of the underlying elements of Section 304 of the Sarbanes-Oxley Act, should the Commission be entitled to summary judgment?  In essence, that is the question now before this Court.

In his prolix opposition, buried deep within its pages, is the rusted lynchpin to Jenkins' opposition:  that regardless of what he may have admitted in signing and certifying CSK's 2005 Form 10-K and in his testimony before the Commission, all of his admissions are irrelevant and inadmissible because he was not a percipient witness to CSK's accounting fraud.  Unfortunately, for Jenkins, he cannot so easily escape the consequences of his sworn admissions, as personal knowledge is not a prerequisite for the adoption of another's statement under Fed. R. Evid. Rule 801(d)(2).  In short, Jenkins has already admitted each of the underlying elements of Section 304, and there is no legal -- or factual -- reason why he should not be bound by his admissions.

## II.       ARGUMENT

### A.       Jenkins' signed and sworn statements are admissible against
### him under Fed. R. Evid. 801(d)(2).

Throughout his opposition, Jenkins asserts that his signed and sworn admissions are inadmissible hearsay as he lacks personal knowledge.  In other words, Jenkins'

1

1    opposition is predicated on the notion that he had no knowledge of what he was admitting

2    to when he signed CSK's 2005 Form 10-K, or when he testified before the Commission,

3    and that before granting summary judgment the Commission and this Court should be

4    required to recreate and adjudicate the findings of CSK's internal investigation.  The

5    rules of evidence do not require such judicial inefficiency.

6         By signing and certifying CSK's 2005 Form 10-K, Jenkins adopted the

7    Company's admission of misconduct and is responsible for the statements in that

8    document.  *United States v. Orellana-Blanco*, 294 F.3d 1143, 1148 (9th Cir. 2002)

9    (personal knowledge is not a prerequisite for the adoption of another's statement pursuant

10   to Fed. R. Evid. 801(d)(2));  *Howard v. Everex Sys., Inc*. 228 F.3d 1057, 1061(9th Cir.

11   2000) ("when a corporate officer signs a document on behalf of the corporation, that

12   signature would be rendered meaningless unless the officer believes the statements in the

13   document are true").

14        Accordingly, by signing and certifying CSK's 2005 Form 10-K, Jenkins admitted

15   that CSK's second restatement was a result of misconduct.  In addition, Jenkins

16   repeatedly reaffirmed that fact during his testimony before the Commission, in which he

17   admitted that  he had been fully briefed on the results of CSK's Audit Committee-led

18   investigation and, as a result of that investigation, he understood that LWT vendor

19   allowance funds had been moved to earlier years to make up for shortfalls in collections

20   which "should not have been done;" erroneous debits had been made to vendors which

21   had to be paid back; and Don Watson had lied to him, as well as to the Audit Committee,

22   in characterizing CSK's first restatement as a result of mere errors in estimates, as

23   opposed to intentional fraud.  PSSF ¶¶ 28-46.  As Jenkins testified, "things were done on

24   purpose."  PSSF ¶ 40.

25        In short, Jenkins clearly understood, when he signed and certified CSK's 2005

26   Form 10-K, that both he and the company were acknowledging not only "misconduct"

27   *i.e.,* improper behavior by certain employees in its Finance Department, but *management*

28   *fraud*.  Thus, CSK's 2005 Form 10-K, standing alone, is sufficient to establish each of the

2

1    underlying elements of Section 304.

2         Jenkins does not dispute that his signature on CSK's 2005 Form 10-K is an

3    adoptive admission, but argues that to the extent the document contains hearsay

4    statements by others, Fed. R. Evid. 805 requires that each of those statements must come

5    within a recognized hearsay exception.  Jenkins also argues that Fed. R. Evid.  602

6    imposes a personal knowledge requirement on the admissibility of adoptive admissions

7    under Rule 801(d)(2)(b).

8         Jenkins reliance on Rule 805 is entirely misplaced.  Rule 805 provides that

9    "hearsay included within hearsay is not excluded under the hearsay rule if each part of

10   the combined statements conforms with an exception to the hearsay rule provided in

11   these rules."  The recognized exceptions to the hearsay rule are set forth in Rules 803 and

12   804.  Significantly, an admission by a party opponent is not hearsay under Rule 801 and,

13   hence, the requirements of Rule 805 are simply not applicable.  *See Mahlandt v. Wild*

14   *Canid Survival and Research Center, Inc.* 588 F.2d 626, 630-31 (8th Cir. 1978) (Rule 805

15   not applicable to Rule 801); *In re A.H. Robins Co*., 575 F. Supp. 718, 723-25 (D. Kan.

16   1983) (same).  *See also, United States v. Hernandez*, 105 F.3d 1330, 1332 (9th Cir. 1997)

17   (a defendant's admissions are specifically exempted from the hearsay rules).

18        Similarly, it is well recognized that there is no personal knowledge requirement

19   for adoptive admissions under Rule 801(d)(2)(B).  *See, MCI Communications, Inc., v.*

20   *AT&T*, 708 F.2d 1081, 1143 (7th Cir. 1982) (admitting internal company report under

21   801(d)(2)(D) as it formed the basis for company action); *Wagstaff v. Protective Apparel*

22   *Corp. of America*, 760 F.2d 1074, 1078 (10th Cir. 1985)  (by reprinting newspaper articles

23   and distributing them to business associates, defendants manifested their adoption of the

24   inflated statements made therein); *Mahlandt v. Wild Canid Survival and Research*

25   *Center, Inc.* 588 F.2d at 630-31; *Pekelis v. Transcontinental & Western Air., Inc*., 187

26   F.2d 122, 128 (2nd Cir. 1951) ("if the principal expressly said either before or after the

27   agent spoke that he vouched for the agent's statement or wanted action taken upon it, then

28   it is his statement"); *Grundberg v. Upjohn Co*., 137 F.R.D. 365, 370-371 (D. Utah 1991)

1  (Upjohn adopted conclusions of independent drug study by submitting it and underlying

2  patient reports to the FDA as a basis for approval of new drug); *White Industries, Inc. v.*

3  *The Cessna Aircraft Company*, 611 F. Supp. 1049, 1063 (D. Mo. 1985) (where a party

4  has actively sought out the specific information in question, and has acted upon it in some

5  significant, identifiable way, the information qualifies as an adoptive admission).

6        Both CSK and Jenkins adopted the findings of CSK's internal investigation.  That

7  investigation was the basis for CSK's second restatement, its findings were

8  commissioned by, reported to and acted upon CSK's Audit Committee, and Jenkins

9  adopted those findings, both in signing CSK's 2005 Form 10-K and during his testimony

10  before the Commission.  As such, Jenkins' statements and admissions relating to the

11  results of CSK's internal investigation are admissible under Fed. R. Evid. 801(d)(2)(B).[1]

12

13        **B.    Both CSK and Jenkins have admitted that CSK's Second**
          **Restatement was the result of management misconduct.**

14

15        In an attempt to obfuscate the facts, Jenkins presents the declarations of two

16  experts:  Professor William Holder, who opines that the phrase "errors and irregularities"

17  is an outdated accounting phrase that has no current, commonly-understood meaning; and

18  Peter Solomon, who, based on his review of portions of certain witnesses' testimony

19  _____

20  [1] Jenkins asserts that CSK, in its reply in support of its motion to dismiss the second

21  amended consolidated class action complaint, asserted that it had made no admission of
   scienter in its 2005 Form 10-K.  A fair reading of that pleading shows that CSK's

22  argument was centered on the fact that it had made no admission that the *individual*
   *defendants* had engaged in a scheme to inflate net income and that CSK was not

23  responsible for the acts of unidentified low-level employees.  *See* Supp. Searles Decl.,
   Ex. 28 (Case No. CIV-06-1503-PHX-DGC, Dkt. Entry No. 104 at p. 5) ("CSK has not

24  admitted that any Individual Defendant made false accounting entries nor has any
   confidential witness provided facts demonstrating that a lower-level employee would not

25  have done so without an Individual Defendant's approval.").  In any event, in denying
   CSK's and Jenkins' motion to dismiss, Judge Campbell found that CSK's use of the term

26  "irregularities" was significant, as it refers to intentional misstatements.  *Communication*

27  *Workers of America v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1122 (D. Ariz. 2007).
   Moreover, Judge Campbell was aware that SAS 53 had been superseded.  *See* Supp.

28  Searles Decl., Ex. 27 (Case No. CIV-06-1503-PHX-DGC, Dkt. Entry No. 98 at p. 5, n.1).

1    selected by Jenkins' counsel, is unable to conclude that CSK's second restatement was

2    the result of fraud, recklessness or negligence, as opposed to mistake or inadvertence.

3    **1.    The meaning of the phrase "errors and irregularities."**

4    Professor Holder concedes that under AU Section 316 and SAS 53 the word

5    "irregularities," which was used repeatedly in CSK's 2005 Form 10-K to refer to the

6    findings of its Audit Committee-led investigation, refers to intentional misstatements or

7    omissions of amounts or disclosures in financial statements, *i.e.*, fraud.  Holder Decl. ¶8,

8    Exs. C & D.  Professor Holder asserts, however that AU Section 316 and SAS 53 have

9    been superseded, first, in 1997 by SAS 82, and again in 2002 by SAS 99.  Holder Decl., ¶

10   11, Ex. E & F.  Holder notes that neither SAS 82 nor SAS 99 uses the term

11   "irregularities."  *Id*.  Instead, both of those accounting pronouncements use the

12   straightforward word "fraud" to refer to the same type of conduct that SAS 53 had

13   previously referred to as "irregularities."   Holder Decl., Exs. E & F.

14   Professor Holder's deconstruction of the relevant accounting literature begs the

15   question of what CSK and Jenkins intended to convey when they used the phrase "errors

16   and irregularities" in CSK's 2005 Form 10-K to refer to the findings of the company's

17   internal investigation.  As Professor Holder concedes, the phrase "irregularities" is only

18   used in AU 316 and SAS 53, which, under those pronouncements, refers to *intentional*

19   misstatements, *i.e.*, management fraud.  The fact that the term "irregularities" has been

20   replaced in the AICPA Professional Standards ("AU") and the Auditing Standard Boards

21   Statement on Auditing Standards ("SAS") by the word "fraud" hardly means that the

22   CSK's choice of the word "irregularities" is devoid of meaning.[2]  *See Communications*

23   *Workers of America v. CSK Auto Corp*., 525 F. Supp. 2d 1116, 1122, 1124 (D. Ariz.

24   2007) ("more than financial bungling occurred at CSK.  The 10-K and press releases

25

26

27
28   [2] Indeed, in its Wells submission to the Commission, CSK pointedly emphasized "that irregularities, not merely errors, were identified in its historical financial statements that preceded its Audit Committee-led investigation."  PSSF ¶¶ 47-48; Searles Decl., Ex. 11.

1   make clear that "irregularities" – intentional misstatements – occurred.").[3]

2       Finally, any doubt concerning CSK's use of the phrase "irregularities" is put to

3   rest by CSK's robust disclosures in its 2005 Form 10-K, and by Jenkins' testimony

4   before the Commission, where each of them admitted that CSK's internal investigation

5   had revealed intentional accounting misconduct by management.  PSSF ¶ 10, Searles

6   Decl., Ex. 6.

7                **2.      Mr. Solomon's declaration should be ignored.**

8       Mr. Solomon, a specialist in forensic accounting, conducted a cursory review of

9   only a portion of the available evidence in this matter.  By his own admission, he

10  reviewed only "portions" of selected witnesses' testimony before the Commission

11  provided to him by Jenkins' counsel. Solomon Decl., Ex. B.  It is unclear from his

12  declaration whether he, or Jenkins' counsel, selected what "portions" to review.  What is

13  clear, however, is that Mr. Solomon did not conduct a complete review of the available

14  evidence and it appears that he was carefully insulated from the some of the most

15  damning evidence in this case, such as Mr. Jenkins' own testimony (*see* PSSF 28-46), the

16  lengthy FBI-302 report summarizing the Company's disclosures of the results of its

17  internal investigation to the Department of Justice, the F.B.I., the I.R.S, and the U.S

18  Postal Service (*see* Supplemental Declaration of Donald W. Searles In Support of

19  Plaintiff's Motion for Partial Summary Judgment ("Supp. Searles Decl."), Ex. 29); the

20  thousands of business records, e-mail communications and other documents specifically

21  identified by CSK's Audit Committee-led investigation in support of its findings; CSK's

22

23  _____

24  [3] As noted in the Commission's opening memorandum, other courts have continued to
    find that the term "errors and irregularities" refers to management fraud, notwithstanding
25  the fact that AU 316 and SAS 53 have been superseded.  *See* Plaintiff's Memorandum of
    Points and Authorities In Support of its Motion for Partial Summary Judgment
26  ("Plaintiff's MPA"), p. 9. See also *The Financial Numbers Game – Detecting Creative
    Accounting Practices*, p. 49 (Mumford, Charles W. and Comisky, Eugene, John Wiley &
27  Sons, Inc, New York, N.Y. (2002) ("[today the two terms *accounting irregularities* and
    *fraudulent financial reporting* tend to be used interchangeably").  That book can be
28  viewed online at Google books.

1   Wells submission (Searles Decl., Ex. 11) ; and Opper's and O'Brien guilty pleas in the

2   parallel criminal case (Searles Decl., Exs. 12-15).  Furthermore, it appears that the

3   portions of the testimonies provided to Mr. Solomon for his review were carefully

4   excised to remove the portions of the witnesses' testimony where they were apprised of

5   the results of CSK's internal investigation, and the fact that they believed, as Jenkins

6   believed (*see* PSSF ¶ 45), that Mr. Watson and other members of senior management had

7   lied to them and had deceived CSK's Audit Committee and independent auditors about

8   the nature and extent of their multi-year accounting fraud.   *See* Supp. Searles Decl., ¶¶ 2-

9   8, Exs. 20-26.  In short, Mr. Solomon's highly selective and incomplete review of the

10  evidence in this case is a meaningless exercise that does not create any triable issue of

11  fact.  *See, e.g, DeJager Construction, Inc., v. Schleninger*, 938 F. Supp. 446, 449 (W.D.

12  Mich. 1996) (an expert may not simply assemble favorable facts from the record and

13  conclude that liability does or does not exist); *Benhabib v. Hughes Electronics Corp.*,

14  2006 U.S. Dist. LEXIS 97109, *5 (C.D. Cal. Sept. 6, 2006) (precluding expert testimony

15  that are merely the witness' own assessment of the facts).

16        More fundamentally, Mr. Solomon is attempting to supplant his so-called expert

17  opinion for that of CSK's management in answering the question of why CSK decided to

18  issue its second restatement.  That Mr. Solomon is unable to conclude, based on his

19  abbreviated review of the evidence, that CSK's second restatement was the result of

20  fraud, recklessness or even negligence is simply irrelevant and not helpful to the Court.

21  *See United States v. Scop*, 846 F.2d 135, 139-142, *modified*, 856 F.2d 5 (2d Cir. 1988)

22  (trial court erred in permitting a Commission investigator with no personal knowledge of

23  the facts to characterize the defendant's conduct as fraudulent, finding the witness'

24  assessment of the testimony and credibility of other witnesses encroached upon the

25  exclusive province of the jury in weighing witness credibility);  *Hygh v. Jacobs*, 961 F.2d

26  359, 362-364 (2d Cir. 1992) (expert's opinion that arresting officer's conduct was not

27  "justified under the circumstances" required exclusion as an improper legal conclusion);

28  *Conde v. Velsicol Chemical Corp.*, 804 F. Supp. 972, 984 (S.D. Ohio) ("where an expert

becomes an advocate for a cause, he therefore departs from the ranks of an objective witness, and any resulting testimony would be unfairly prejudicial and misleading.") (quotations omitted);   *Dubria v. Smith*, 197 F.3d 390, 400 (9th Cir. 1999) (a witness may not give direct opinion as to guilt or innocence); *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990) (same).  *See also Kidder, Peabody & Co., Inc., v. IAG Internationals Acceptance Group, N.V.*, 14 F. Supp. 2d 391, 399 (S.D.N.Y. 1998) ("[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury") (*quoting United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

Accordingly, Mr. Solomon's declaration should be ignored, and those portions of Jenkins' separate statement of materials facts ("Jenkins' SSF") which regurgitate Mr. Solomon's declaration should be ruled inadmissible (*see* Jenkins' SSF ¶¶ 75-101).[4] *See* Plaintiff's Objections to Defendant's Separate Statement of Material Facts.

## C.   The meaning of the word "misconduct"

Jenkins also takes issue with the Commission's common-sense definition of the word "misconduct" in Section 304, claiming that the word must be construed to require a degree of scienter and at a minimum reckless conduct.  As the Commission explained in its memorandum in support of its motion for partial summary judgment, the rules of statutory construction require that the word "misconduct" be given its ordinary meaning. Plaintiff's MPA, p. 3.  Notably, Congress did not use any qualifiers to modify the term misconduct, such as knowing, willful, wanton, reckless, gross or extreme, and Jenkins' effort to engraft such qualifiers should be rejected.   Furthermore, since "gross

---

[4]  In reviewing the various risk factors that made CSK such fertile ground for accounting fraud, Mr. Solomon claims that the accounting standards for the treatment of vendor allowances were in a state of flux.  Solomon Decl., ¶¶ 14-17.  His point is a proverbial red herring.  The accounting standard that Mr. Solomon alludes to, EITF 02-16, is a revenue recognition standard and has nothing to do with the post-recognition treatment of uncollectible receivables.  GAAP has long required that a company is required to take a charge to income, *i.e.,* write off, uncollectible receivables. *See* SFAS No. 5, Complaint ¶ 22.  That is the governing accounting standard in this case.

negligence" is typically defined to mean "willful misconduct,"[5] it stands to reason that since there are no equivalent modifiers in front of the word "misconduct" in Section 304 that negligent conduct suffices.  Indeed, negligent conduct suffices for securities fraud under Section 17(a)(2) and (3) of the Securities Act of 1993, 15 U.S.C. §77q (*see SEC v. GLT Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir. 2001))*,* and there is no reason that a more culpable level of conduct should be required for a reimbursement action under Section 304.   In any event, regardless of whether the term "misconduct" requires some degree of scienter or recklessness, CSK's 2005 Form 10-K, Jenkins' testimony before the Commission, and Opper's and O'Brien's felony guilty pleas,[6] more than satisfy any such requirement.

---

[5] *See, e.g., Rush University Medical Center v. 3M Co.,* 2007 U.S. Dist. LEXIS 86138, *11 (N.D Ill. Nov. 21 2007); *Ezell v. Bellsouth Telcom.*, 961 F. Supp. 149, 152 (S.D. Miss. 1997); *Marshall Independent School Dist. v. United States Gypsum Co.,* 790 F. Supp. 1291, 1300 (E.D. Tex. 1992).  *See also,* Langevoort, Donald C., *Duties of the Modern Corporate Executive: Article and Essay: On Leaving Corporate Executives "Naked, Homeless and Without Wheels": Corporate Fraud, Equitable Remedies, and the Debate Over Entity Versus Individual Liability*, 42 Wake Forest L. Rev. (Fall 2007) ("There are, of course, many different forms of executive misconduct - commonly, they fall into the categories of breaches of care, loyalty, and candor, and may be characterized by various states of mind, from malice to simple negligence"); Johnson, Lyman P.Q. and Sides, Mark A, *Corporate Governance and the Sarbanes-Oxley Act:  The Sarbanes Oxley Act and Fiduciary Duties*, 30 Wm. Mitchell L.R. 1149, 1223 ("the standard of care for an agent is usually a standard of ordinary care. Thus, simple negligence is a breach of duty.").

[6] Jenkins objects to the Commission's reliance on Opper's and O'Brien's guilty pleas as evidence of misconduct on the grounds that they are not "final judgments" and because the Commission has not shown that Opper and O'Brien are unavailable.  As the Commission explained in its opening memorandum, a guilty plea is a final judgment. *See* Plaintiff's MPA, p. 18.  *See also, Gray v, Commission of Internal Revenue*, 708 F.2d 243, 246 (6th Cir. 1983) ("A guilty plea is as much a conviction as a conviction following a jury trial.").  Moreover, under Fed. R. Evid. 803(22), unavailability of the witness is not required.   Lastly, Opper's and O'Brien's respective admissions of personal involvement in CSK's accounting scandal are essential to sustain their judgments, as they provided a proper factual foundation for their guilty pleas by explaining how they obstructed CSK's internal investigation by not telling CSK's investigators what they knew.  *See Emich Motors Corp. v. General Motors Corp*., 340 U.S. 558, 569 (1951) (parties are "entitled to introduce the prior judgment to establish prima facie all matters of law and fact

## D.    The scope of the Commission's action

Finally, Jenkins argues that the Commission cannot seek summary judgment based on any misconduct other than that relating to vendor allowances.   The Commission's complaint alleges a single claim under Section 304, and thus is unlike *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1079 (9th Cir. 2008), where plaintiffs attempted to allege a *new claim* in an effort to defeat summary judgment.  Nor can Jenkins allege any surprise by the Commission's reliance on the entirety of CSK's 2005 Form 10-K.  CSK's second restatement is plainly alleged in the Complaint and Jenkins requested that the Court take judicial notice of that filing in connection with his motion to dismiss.  *See* Jenkins RJN, Ex. 8 (Dkt. Entry No. 8).  *See also*, Searles Decl., Ex. 6.  In addition, in its responses to Jenkins' second set of interrogatories, requesting, *inter alia*, that the Commission describe all facts in support of the statement in CSK's second restatement that there were "irregularities" in the preparation of CSK's financial statements, the Commission directed Jenkins to CSK's 2005 Form 10-K, which describes all of the "irregularities" that were found by CSK's Audit Committee-led investigation.  Weingart Decl., Ex. C (Response to Interrogatory No. 28).  The Commission also referred Jenkins to the FBI-302 report, which summarizes the disclosures made by CSK's outside counsel to the Department of Justice regarding the complete findings of CSK's internal investigation.  *Id.*  See Supp. Searles Decl., Ex. 29.  Accordingly, it is inaccurate for Jenkins to contend that the Commission has restricted its factual proof in support of its Section 304 claim to vendor allowances only.  *See Cooper v. Dupnik*, 924 F.2d 1520, 1535 (9th Cir. 1991) (under federal notice pleading, parties are entitled, at summary judgment stage, to vary their theory to conform to the proof presented); *Sparrow v.*

_____

necessarily decided by the conviction and the verdict on which it is based."); *United States v. Perlmuter*, 693 F.2d 1290, 1294 (9th Cir. 1982) (Rule 803(22) is "intended as a vehicle for proving underlying facts when a judgment of conviction is presented."); *Miller v. Holtzman,* 563 F. Supp. 2d 54, 85 (D. D.C. 2008) (because Fed. R. Crim. P. 11 demands that a court assure itself of a factual basis for any guilty plea, the admissions made in a defendant's plea documents are essential to the judgment).  Finally, there is no question that their admissions of guilt are statements against interest.

1  *United AirLines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000) (plaintiff need not plead all

2  of the facts it eventually must prove).

3      Nor does Jenkins contend he is prejudiced in any way – and he is not – as his

4  overarching defense is that he lacks personal knowledge of the myriad accounting

5  misconduct found by CSK's Audit Committee-led investigation.  *See, e.g., Camarillo v.*

6  *McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (in absence of showing of prejudice,

7  affirmative defense may be raised for the first time at summary judgment); *Ahmad v.*

8  *Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (same) (collecting cases); *Coleman v.*

9  *Quaker Oats, Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (district court properly refused to

10  consider plaintiff's disparate impact claim, raised for the first time after the close of

11  discovery, as it would require defendant to develop entirely different defenses).

12      In any event, even if CSK's improper accounting for vendor allowances had been

13  the only basis for its second restatement, CSK's 2005 Form 10-K makes clear that both

14  errors *and* irregularities were found by its internal investigation relating to vendor

15  allowances, and that the required changes in CSK's vendor allowance recognition were

16  material.  PSSF ¶ 22, 27; Searles Decl., Ex. 6.

17  **III.    CONCLUSION**

18      For all of the foregoing reasons, the Commission's motion for partial summary

19  judgment should be granted.[7]

20  DATED:  November 12, 2010               Respectfully submitted,

21
22                                          /s/ Donald W. Searles
                                            DONALD W. SEARLES
23                                          Attorneys for Plaintiff
                                            Securities and Exchange Commission

24

25

26

27  [7]  To the extent Jenkins has made other arguments not addressed in this reply, such as
    admissibility of Watson's invocation of his Fifth Amendment right against self-
28  incrimination, and the admissibility of CSK's Wells submission, the Commission
    continues to stand by its opening brief, which fully sets forth the Commission's position.

1

## **PROOF OF SERVICE**

2

I am over the age of 18 years and not a party to this action.  My business address is:

3

[X]    U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire
        Boulevard, 11th Floor, Los Angeles, California 90036-3648

4

        Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

5

6

7

On November 12, 2010, I caused to be served the document entitled **REPLY TO OPPOSITION TO  PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT MAYNARD L. JENKINS** on all the parties to this action addressed as stated on the attached service list:

8

9

10

[ ]    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

11

12

13

        [ ]    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

14

15

        [ ]    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

16

[ ]    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

17

18

19

[ ]    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

20

[ ]    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

21

22

[X]    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

23

24

[ ]    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

25

        I declare under penalty of perjury that the foregoing is true and correct.

26

27

Date:    November 12, 2010            /s/ Donald W. Searles
                                      Donald W. Searles

28

**SEC v. Maynard L. Jenkins**
**United States District Court - District of Arizona**
**Case No. 2:09-cv-01510-JWS**
**(LA-3305)**


SERVICE LIST


John W. Spiegel, Esq. **(served via CM/ECF only)**
Jenny M. Jiang, Esq. **(served via CM/ECF only)**
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Email:  john.spiegel@mto.com
Email:  jenny.jiang@mto.com
*Attorneys to Defendant Maynard L. Jenkins*